IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ADVANCE CABLE COMPANY, LLC and
PINEHURST COMMERCIAL INVESTMENTS, LLC,

                Plaintiffs,                      OPINION & ORDER

     v.                                 13-cv-229-wmc

THE CINCINNATI INSURANCE COMPANY,

                Defendant.

During a severe storm in Middleton, Wisconsin, on April 3, 2011, hailstones dented a metal roof on a commercial building owned by plaintiffs Advance Cable Company, LLC and Pinehurst Commercial Investments, LLC (collectively, "Advance Cable"). Shortly after, Advance Cable sought compensation for this denting pursuant to its property insurance policy with The Cincinnati Insurance Company. When a coverage dispute arose between the parties, Advance Cable filed this lawsuit alleging that defendant Cincinnati Insurance breached the insurance policy and acted in bad faith.

Various motions are now pending before the court. Advance Cable moves for partial summary judgment declaring that the policy by its terms provides coverage for the denting sustained in the hailstorm. (Dkt. #40.) Cincinnati Insurance moved to stay briefing on that motion pursuant to Federal Rule of Civil Procedure 56(d) in order to conduct additional discovery. (Dkt. #46.) On the same day, however, Cincinnati Insurance also filed its own motion for summary judgment, asking the court to find as a matter of law that: (1) purely cosmetic, unnoticeable denting does not qualify for coverage under the terms of the policy; and (2) even if it does, the issue was "fairly debatable," precluding plaintiffs' bad

faith claim.[1]  (Dkt. #49.)  Finally, plaintiffs move to strike two of Cincinnati Insurance's affidavits and additional proposed findings of fact in support of its cross-motion for summary judgment (dkt. ##69-71) on the grounds that they contain new argument.  (Dkt. #80.)  For the reasons that follow, the court will deny defendant's 56(d) motion, grant plaintiffs' motion for summary judgment and deny in part and grant in part defendant's cross-motion for summary judgment.

UNDISPUTED FACTS

**A.  The Parties**

Plaintiffs Advance Cable Company, LLC and Pinehurst Commercial Investments, LLC are both limited liability companies whose owner and sole member is Michael G. Larson, an adult citizen and resident of the state of Wisconsin.[2]  Defendant The Cincinnati Insurance Company is a foreign insurance company, which was incorporated under the laws of Ohio, with its principal place of business in Fairfield, Ohio.

---

[1]  Like plaintiffs' motion, Cincinnati Insurance also maintains that its *own* motion for summary judgment is premature.  (Def.'s Br. Supp. of Rule 56(d) Mot. (dkt. #47) 4 ("[T]hese summary judgment motions are premature.").)  Cincinnati Insurance explains that its cross-motion was filed in an "abundance of caution," just as it filed a brief opposing Advance Cable's motion for summary judgment in case its own Rule 56(d) motion was denied.  Even so, it is unclear that Rule 56(d) would give Cincinnati Insurance the right to defer its *own* motion, since the rule on its face applies to instances when facts are unavailable to the *non*-movant.  *See* Fed. R. Civ. P. 56(d).  Because the court is denying the Rule 56(d) motion, however, it need not address this procedural maneuver further.
[2]  Defendant does not respond to plaintiffs' jurisdictional allegations, contending that it will need to "verify all jurisdictional allegations with documentation and deposition testimony."  (Def.'s Resp. to PPFOF (dkt. #55) ¶ 2.)  It has not, however, pointed to any admissible evidence suggesting that Larson's citizenship is actually disputed, and so the court considers its jurisdiction undisputed as pled for purposes of the parties' cross-motions for summary judgment.

### B.  The Policy

Cincinnati Insurance issued Commercial Primary Policy number EPP 003 30 85 / EBA 003 30 85 ("the Policy") for blanket building coverage to Advance Cable Company, LLC, in Wisconsin effective from August 1, 2010, until August 1, 2013.  The Policy set first party property damage limits of $2,075,000.  On March 17, 2011, Pinehurst Commercial Investments, LLC was added as a named insured to the Policy.

The Policy provides the following general grant of coverage:

> We will pay for direct physical "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

The Policy defines "loss" as "accidental loss or damage," and "Covered Property" "means the following types of property for which a Limit of Insurance is shown in the Declarations: a. Building," which includes "blanket building coverage."   "Premises" is defined as "the Location of Premises described in the Declarations," which in turn includes:

> 2113 EAGLE DR
> MIDDLETON, WI 53562-2551

The Policy's "Commercial Property Coverage Part" defines "Covered Cause of Loss" as follows:

> Covered Cause of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the "loss" is:
>
> (1) Excluded in SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions; or
>
> (2) Limited in SECTION A. COVERAGE, 3. Covered Causes of Loss, c. Limitations[.]

3

### C. The Storm

On April 3, 2011, Middleton, Wisconsin was hit by a severe storm, which included hail.  On April 14, 2011, Cincinnati Insurance Field Claim Superintendent Curt Jorgenson met with the president of Advance Cable, Mike Larson, and inspected the roofs of two buildings covered by the Policy, one of which was the 2113 Eagle Drive property.   The parties dispute whether Larson observed any obvious hail damage to the roofs, but they agree that he observed dents in a soft metal vent top and to the fins of air conditioning units on both buildings.  Larson informed Jorgenson that he would have the air conditioning units checked for hail damage.

On June 7, 2011, Jorgenson put together an estimate of $2,512.70 for both buildings to straighten the bent coil fins on the air conditioning system on and for roof vent cap repair.  Jorgenson sent his estimate to Larson by regular mail.  On July 18, 2011, Jorgenson mailed another letter, enclosing another copy of his June 7th estimate and inquiring whether Larson had arranged for an evaluation of the air conditioning units.  Larson and Jorgenson had a follow-up phone conversation on July 20, 2011.  That same day, Jorgenson forwarded Larson a check in the amount of $1,512.70, payable to Advance Cable, LLC and Pinehurst Commercial, representing the $2,512.70 estimate of June 7, less the $1,000 deductible on the Policy.[3]  Like the denting to the metal roofs, damage to the metal vent caps, and the HVAC units of which they are a part, are not visible from ground level.

---

[3] Advance Cable purports to dispute that Larson stated that the June 7 estimate was acceptable and that Cincinnati Insurance could process the claim on that basis.  It does admit, however, that it "received a check in the amount of Cincinnati's June 7, 2011 estimate, which suggests that Advance Cable agreed to the amount."  (Pl.'s Resp. to DPFOF (dkt. #65) ¶ 8.)

On January 13, 2012, Larson indirectly received a message from a roofing inspector, Scott Martin, stating that "[t]here is definitely hail damage."[4] On January 16, 2012, Jorgenson spoke on the phone with Larson.  During that conversation, Larson indicated he had been contacted by a roofing company and a prospective buyer of the 2113 Eagle Drive property.  As a result, Larson wanted a re-inspection.  Jorgenson notified Larson at some point that he would retain Structural Research, Inc. ("SRI") to inspect both buildings' roofs. On February 1, 2012, Jorgenson, Gregory Phillips of SRI, Larson and two representatives of Great Lakes Roofing inspected the roofs at the two properties, including 2113 Eagle Drive.

After Phillips reported the results of his inspection, Jorgenson obtained a copy. Dated February 23, 2012, the Report stated in part:

> Roofing on … these properties is comprised of galvanized standing seam metal roofing panels installed over a loose laid over purlin insulation system (photos #1-2).  Metal roof panel denting characteristic of hail impact was found on several buildings.  Dents related to hail impact varied in size from barely discernible to approximately 1" … diameter (photos #3-6).  Hail impact denting of metal heat stack caps and metal coping was also observed (photos #7-9).

Jorgenson e-mailed a copy of the Report to Larson on April 9, 2012.

On June 5, 2012, Larson informed Jorgenson that he had sold the 2113 Eagle Drive property to one of the Welton Enterprises entities but asked Cincinnati to pay the claim on the 2210 Pinehurst Drive property.  On June 20, 2012, Jorgenson telephoned Larson and indicated that Cincinnati would make a compromise offer of $10,000 on the 2210

---

[4] Cincinnati Insurance denies that the property to which Martin referred was the 2113 Eagle Drive property at issue here.  However, the cover e-mail states that "Great Lakes Roofing look[ed] at the Eagle Drive roof" and that the inspector was Scott Martin.  (*See* Larson Aff. Ex. A (dkt. #66-1).) Thus, the court finds no genuine dispute of fact for purposes of the current motions despite Cincinnati Insurance's denial.

Pinehurst Drive property.  By July 27, 2012, Larson responded that he was still considering the $10,000 offer and requested that Jorgenson put the offer in writing.

On September 28, 2012, the broker for the Policy e-mailed Jorgenson an estimate from Ruedebusch Development & Construction in the amount of $58,577 for replacement of roof panels and other repairs to the 2210 Pinehurst Drive property.  Jorgenson responded with a letter reading in part:

> We have a copy of your submitted roof estimate from Ruedebusch Development & Construction dated September 28, 2012.  Our previous outlined position is unchanged. ... You have previously been provided ... a copy of the report by Gregory Phillips of Structural Research who did inspect the property and roofing.  He stated in his report that the metal roof panel denting will not affect the performance of panels, or detract from life expectancy.  Also, the denting was relatively minor and cannot be viewed from the ground.  Therefore, Cincinnati Insurance Company does not be[li]eve the roof has sustained damage that would require repair or replacement.  Nevertheless, Cincinnati Insurance Company would consider a compromise settlement to avoid the costs and risk of litigation.  Therefore, we have extended an offer of $10,000 in exchange for signed release.

(Jorgeson Aff. Ex. I (dkt. #52-8) 2.

On or before April 2, 2013, Larson telephoned Jorgenson and indicated that he wanted to finalize the settlement for the 2210 Pinehurst Drive property in the $10,000 amount.  The parties did so.  (*See* Jorgenson Aff. Ex. K (dkt. #52-10) 3.)  Nothing in the record suggests that such an offer was ever tendered with respect to the 2113 Eagle Drive property.

OPINION

## I. Request for Rule 56(d) Stay

Federal Rule of Civil Procedure 56(d) states that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [of a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Here, Cincinnati Insurance requests that the court defer considering the parties' cross-motions for summary judgment until it has had time to take discovery on three issues: (1) whether Advance Cable complied with a provision requiring them to begin and effect repairs within two years of the April 3, 2011, hailstorm; (2) whether Advance Cable is the real party in interest; and (3) whether the citizenship of Mike Larson, the sole member of the plaintiff limited liability companies, destroys diversity jurisdiction.  (*See* Def.'s Br. Supp. Rule 56(d) Mot. (dkt. #47).)

Rule 56 "does not require that discovery take place in all cases before summary judgment can be granted."  *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648 (7th Cir. 2006).  The "fact that discovery is not complete – indeed has not begun – need not defeat [a motion for summary judgment.]"  *Id.* (quoting *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 729 (7th Cir. 1986)).  Thus, while defendant is correct that Rule 56(d) provides a mechanism to defer consideration of *premature* summary judgment motions, summary judgment motions that are simply *early* are not necessarily precluded. *See* 11 James Wm. Moore, *Moore's Federal Practice* § 56.100[1] (3d ed. 2013) ("[A]n early summary judgment motion might not be premature if it raises issues that can be resolved

fairly without the need for the opposing party to take discovery to gather the responsive proof.").

Here, Advance Cable moves for partial summary judgment, essentially seeking a legal declaration that the dents in the roof of the property are covered under the terms of the Policy.  For relief to be appropriate under Rule 56(d), Cincinnati Insurance must show that "it cannot present *facts essential to justify its opposition*" of this particular motion for summary judgment.  Fed. R. Civ. P. 56(d) (emphasis added).  If *unrelated* discovery has yet to be completed or commenced, there is no unfairness in requiring Cincinnati Insurance to respond to Advance Cable's motion for partial summary judgment.  *See* 11 James Wm. Moore, *Moore's Federal Practice* § 56.102[3] ("To be 'essential to justify' opposition to summary judgment, the facts specified in the Rule 56(d) affidavit must be material.  In other words, they must be such that, in the circumstances of the case, their existence could preclude summary judgment."); *cf. Waterloo Furniture Components, Ltd.*, 467 F.3d at 648 (no abuse of discretion in denying 56(d) motion where summary judgment turned on expiration date of agreement and additional discovery sought had no bearing on that issue).  This requirement is fatal to Cincinnati Insurance's Rule 56(d) motion, since none of the facts that Cincinnati Insurance purports to seek are "essential" for it to offer an opposing interpretation of the Policy's terms.

*First*, Cincinnati Insurance argues that additional discovery must be taken on whether Advance Cable began repairs or replacement within two years of the date of loss, since the failure to do so would render them ineligible for Replacement Cost valuation. Even if true, Cincinnati Insurance points to nothing in the Policy that suggests the failure to effect repairs or replacement after two years would *exclude* the costs of repair.  The Policy

8

states in "Section F: Optional Coverages" that "Replacement Cost (without deduction for depreciation) *replaces* 'Actual Cash Value' in **SECTION D. LOSS CONDITIONS, 7. Valuation**." (Larson Aff. Ex. 1 (dkt. #42-1) 52 (emphasis added).) This section of the policy goes on to explain that Cincinnati Insurance "will not pay *on a replacement cost basis* for any 'loss'" if the repairs or replacement have not begun within two years of the date of loss. (*Id.* (emphasis added).) Thus, the failure to begin repairs within two years of the loss precludes the recovery of *replacement costs*, not all costs.

Cincinnati Insurance's insistence that failure to comply with the two-year-repair requirement means "the loss would not be covered" and that "[t]he issue whether the hail denting caused 'direct physical loss' would be moot" (Def.'s Br. Supp. Rule 56(d) Mot. (dkt. #47) 5) is simply without support in terms of the Policy -- in fact, Cincinnati Insurance points to nothing in the Policy suggesting that non-compliance with the two-year-repair requirement forfeits *coverage*. Its assertions to the contrary are flatly mistaken.[5] In any event, the court need not attempt to untangle the substantive issues related to the two-year-repair requirement that the parties dispute at this time.[6] For now, it is enough that the "unavailable facts" identified by Cincinnati Insurance have no bearing on the limited issue on which Advance Cable has moved for partial summary judgment within the meaning of Rule 56(d).

---

[5] For instance, Cincinnati Insurance states that "[p]laintiffs seek replacement cost coverage [to the exclusion of actual cash value], because they are seeking the cost to replace the roofs without depreciation," but the cited paragraphs in the Second Amended Complaint say no such thing. (*See* 2d Am. Compl. (dkt. #18) ¶¶ 25-27).

[6] For instance, the court declines to resolve the question of whether the doctrine of prevention prevents Cincinnati Insurance from applying the two-year-repair requirement to deny Replacement Cost valuation.

*Second*, Cincinnati Insurance argues that it requires additional time to discover whether Advance Cable is the real party in interest in this suit.  Cincinnati Insurance has since raised this standing issue, though that motion is not yet under advisement.  (*See* dkt. #104.)  Regardless, even if Advance Cable were not the true party in interest, it would not affect this court's interpretation of the Policy's definition of "direct physical loss," nor the application of that interpretation to the undisputed facts.

*Third*, Cincinnati Insurance argues that "discovery is necessary to verify that Mike Larson is the sole member of plaintiff limited liability companies, and that he is a citizen of Wisconsin."  (Def.'s Br. Supp. Rule 56(d) Mot. (dkt. #47) 9.)  In support, Cincinnati Insurance argues that while "Paragraphs 2 and 3 of Larson's affidavit in support of plaintiffs' summary judgment motion does assert that he is the sole owner and member of plaintiffs, … he does not provide *his* address and state of [c]itizenship."  (*Id.* (emphasis in original).)  As Advance Cable points out in its response, this is demonstrably false: the first paragraph of Larson's affidavit states, "I am an adult citizen and resident of the State of Wisconsin, domiciled at 3004 Sunrise Court, Middleton, Wisconsin 53562."  (Larson Aff. (dkt. #42) ¶ 1; *see* Pls.' Resp. Rule 56(d) Mot. (dkt. #56) 8 n.11.)  Perhaps recognizing its error, Cincinnati Insurance makes no further argument on this point in its reply, and the court need not address it further.

## II. Cross-Motions for Summary Judgment

Having determined that there is no basis for deferring summary judgment under Rule 56(d), the court proceeds to consider the parties' cross-motions for summary judgment. Summary judgment is appropriate if the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Id.* at 323.

## A. Advance Cable's Motion for Partial Summary Judgment

Advance Cable seeks partial summary judgment that the Policy provides coverage for the damage caused by the April 3, 2011, hailstorm to its insured commercial building located at 2113 Eagle Drive.  For purposes of its own motion only, Advance Cable assumes, as Cincinnati Insurance contends, that the denting caused by the hail is merely "cosmetic," rather than structural and that the damage is not visible from the ground.  Even under this

version of the facts, Advance Cable contends that the plain terms of the Policy cover cosmetic denting.

Under Wisconsin law, "the construction of language in an insurance policy ... is a question of law, appropriately disposed of on a summary judgment motion." *Burgess v. J.C. Penney Life Ins. Co.*, 167 F.3d 1137, 1139 (7th Cir. 1999).[7]   The rules that govern legal construction and interpretation of insurance policies are generally the same as those applicable to other contracts. *RTE Corp. v. Maryland Cas. Co.*, 74 Wis. 2d 614, 620, 247 N.W.2d 171 (1976) (citations omitted).   "Words in context shall be construed according to common and approved usage and shall be given their plain, ordinary, popular and usual meaning whenever possible." *Id.* at 623 (citations omitted).

With that in mind, "[a]n insurance policy must be construed in accordance with the test of what a reasonable person in the position *of the insured* would have understood the words to mean." *Id.* at 624 (citing *McPhee v. Am. Motorists Ins. Co.*, 57 Wis. 2d 669, 676, 205 N.W.2d 152 (1973)) (emphasis added).   If terms in the policy are ambiguous, they are construed against the insurance company -- that is, in favor of coverage -- just as exclusions are narrowly construed against the company -- again, in favor of coverage. *Frost ex rel. Anderson v. Whitbeck*, 2002 WI 129, ¶ 19, 257 Wis. 2d 80, 654 Wis. 2d 225.   Ambiguity is a question of law and exists when words are "so imprecise and elastic as to lack any certain interpretation or are susceptible to more than one reasonable construction." *Id.* ¶ 18.

---

[7] Insurance policies that issue in Wisconsin are governed by that state's law. *United States v. Thorson*, 300 F. Supp. 2d 828, 833 (W.D. Wis. 2003) (citing *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 119 Wis. 2d 722, 31 N.W.2d 156 (1984)).

Under Wisconsin law, "[i]t is well established that a claim for benefits under an insurance policy gives rise to a shifting burden of proof." *Kozlik v. Gulf Ins. Co.*, 2003 WI App 251, ¶ 8, 268 Wis. 2d 491, 673 N.W.2d 343. "The claimant bears the initial burden to prove that his or her loss falls within the policy's broad grant of coverage." *Id.* (citing *Glassner v. Detroit Fire & Marine Ins. Co.*, 23 Wis. 2d 532, 536, 127 N.W.2d 761 (1964)). "If the claimant meets this burden, the burden shifts to the insurer to prove that an exclusion precludes coverage for the loss." *Id.* (citing *Glassner*, 23 Wis. 2d at 536).

In this case, it is undisputed that the policy provides for coverage "for direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Def.'s Resp. to PPFOF (dkt. #55) ¶ 15.) The court, therefore, considers whether the undisputed facts fall within each of these requirements.

### i.   Direct Physical "Loss"

The Policy defines "loss" as "accidental loss or damage." (Resp. to PPFOF (dkt. #55) ¶ 16.) The other terms appear to be undefined in the Policy. (*See* Larson Aff. Ex. 1 (dkt. #42-1) 52-54.) The question, then, is whether "purely cosmetic" denting in the metal roof constitutes direct, physical and accidental loss or damage as a reasonable insured would understand those terms.

Advance Cable contends that the denting is "direct" because there was an "immediate, non-incidental causal relationship between the hail and the [denting] to the property." (Pls.' Br. Supp. Mot. Summ. J. (dkt. #41) 9.) Cincinnati Insurance does not appear to quarrel with this argument, and the court has no trouble concluding that a reasonable insured would interpret "direct" to cover effects, like the denting here, that were immediately attributable to hail, without any intervening cause. *See* 10A Steven Plitt et al.,

13

*Couch on Insurance* § 148:60 (3d ed. 2013), *available at* Westlaw COUCH ("[T]he word 'direct' means merely 'immediate' or 'proximate' as distinguished from 'remote.'").

While both sides also start with the premise that "physical" in essence means "material," the parties disagree as to whether the denting meets that definition.  Advance Cable argues that the dents are "material" insofar as they are related to tangible matter and are perceptible to the senses.  As support, Advance Cable proffers various dictionary definitions, noting that guidance in construing the common meaning of an insurance policy term is appropriately sought in recognized, non-legal dictionaries.  *See Weimer v. Country Mut. Ins. Co.*, 216 Wis. 2d 705, 722-23, 575 N.W.2d 466 (1998).  Cincinnati Insurance's argument is less clear, but it appears to be that the denting is not "material" in the sense of being subjectively important or significant.

In support of its interpretation of the term "physical," Cincinnati Insurance cites *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260 (D. Mass. 2004).  In that case, a windstorm damaged a large ash tree known as the "Poltergeist Tree" located at the thirteenth hole of a golf course.  *Id.* at 262.  The course was insured against "direct physical loss or damage to golf course grounds."  *Id.* at 264.  The insurer paid Crestview's claim in full for damage to the trees on the course, including the Poltergeist Tree, but not for a redesign of the thirteenth hole, which Crestview maintained had suffered an alteration in its "character, challenge, rating, slope and psychology" by virtue of losing the Poltergeist Tree.  *Id.* at 262-63.  The parties dispute centered on whether this alteration in the thirteenth hole's characteristics was covered "direct physical loss or damage" to the golf course grounds.  *Id.* at 262-63.

The *Crestview* court held that the redesign claim was not covered under the insurance policy because the word "'physical' must be given its plain meaning -- 'material,' . . . and an intangible loss in value of a golf course because of a change in its slope rating, difficulty, etc., does not fit within this meaning." *Id.* at 264. Likewise, the *Crestview* court held that "the 'character' of the course is not part of the policy's definition of 'golf course grounds.'" *Id.* Cincinnati Insurance seizes on this language, arguing that "'cosmetic damage' to the roof in the instant case is not 'physical' because the denting is not 'material,' and the 'direct physical loss' language does not require Cincinnati to replace the roofs to return them to their former 'character' – *i.e.*, their former non-dented physical appearance." (Def.'s Resp. & Br. in Support of Def.'s Mot. Summ. J. (dkt. #50) 15.)

Cincinnati Insurance's reading of the *Crestview* decision is muddled at best. As Advance Cable points out, Cincinnati Insurance selectively omit portions of the quotations that appear to undermine its reading:

> The only "physical" damage to the thirteenth hole was the harm to the Poltergeist Tree itself, a claim which has been paid. Plaintiffs' present claim, in contrast, encompasses work necessary to return the hole *not to its former physical appearance, but to the same subjective level of difficulty.* The policy is not designed for such coverage and, accordingly, the court will enter partial summary judgment in Defendant's favor.

*Crestview Country Club*, 321 F. Supp. 2d at 265 (emphasis added). In contrast, in this case, Advance Cable's claim encompasses work necessary to return the dented roof "to its former physical appearance." There is nothing "subjective" or "intangible" about this claim. Thus, *Crestview Country Club* is not only unhelpful to Cincinnati Insurance, it actually provides support for the conclusion that a claim for work required to return property to its "former physical appearance" is covered under a policy insuring against "direct physical loss."

15

Cincinnati Insurance's broader argument that "cosmetic" denting is not physical because it is not "material" is similarly unpersuasive.  "Physical" means "material" in the sense of being "composed of matter," with non-physical damage being that which is "incorporeal" or "intangible."  *See, e.g., Crestview County Club*, 321 F. Supp. 2d at 264-65 (collecting cases and noting that "once physical damage is fixed and paid for by the insurer, any diminution in value, income or use is not 'physical damage'"); 10A *Couch on Insurance* § 148:46 (3d ed. 2013) *available at* Westlaw COUCH (noting that "[t]he requirement that the loss be 'physical,' given the ordinary definition of that term[,] is widely held to exclude alleged losses that are intangible or incorporeal") (footnote omitted).  Cincinnati Insurance does not argue, nor can it, that the denting is incorporeal or intangible; the parties agree that there are *actual physical* dents in the roof, however minor, that are "composed of matter" and perceptible to the senses.    Accordingly, the denting in this case is unambiguously "physical" in nature.  *See Smith v. Atl. Mut. Ins. Co.*, 155 Wis. 2d 808, 811, 456 N.W.2d 597 (1990) ("[W]hen the terms of an insurance policy are plain on their face, the policy must not be rewritten by construction.").

Finally, the parties disagree on whether the denting in this case is a "loss," defined within the Policy as "accidental loss or damage."  Advance Cable argues that even purely cosmetic denting constitutes "loss or damage" because it has altered the roof's appearance. *See Cincinnati Ins. Co. v. Heresite Protective Coatings, Inc.*, No. 07-C-648, 2008 WL 110501, at *4 (E.D. Wis. Jan. 8, 2008) ("[T]o the average, ordinary person, tangible property suffers a physical injury when the property is altered in appearance, shape, color or in the other material dimension.") (quoting *Tweet/Garot-August Winter, LLC v. Liberty Mut. Fire Ins. Co.*, No. 06-C-800, 2007 WL 445988, at *5 (E.D. Wis. Feb. 7, 2007)).  Cincinnati Insurance's

position appears to be that the denting in this case is not "loss or damage" because it: (1) is not visible from ground level; and (2) did not affect the structural integrity or life of the roof.

For this proposition, Cincinnati Insurance relies primarily on *Ports of Indiana v. Lexington Ins. Co.*, No. 1:09-cv-0854-TWP-MJD, 2011 WL 5523419 (S.D. Ind. Nov. 14, 2011). *Ports of Indiana* involved an insurance policy covering a dock wall; the policy insured against "[a]ll risks of direct physical loss or damage to property described herein," though it went on to exclude loss or damage caused by inherent vice, gradual deterioration, ordinary wear and tear, normal settling or shrinkage, evaporation, loss of weight, rust, corrosion, design error, poor workmanship, or use of faulty materials. *Id.* at *9. The parties agreed that one portion of the wall, Bollard #7, was covered, but disagreed as to whether other portions of the wall were covered. Ports of Indiana argued that those other portions had been structurally damaged by a "perfect storm" of natural phenomena and that the dock's failure was imminent. Lexington maintained that the wall was not compromised and that -- to the extent that it had been -- these other weaknesses "did not cause a failure" and thus were not excluded by the policy. *Id.* at *2.

The court denied Ports of Indiana's motion for summary judgment, noting that the property was "a dock wall that is largely underwater" and "[a]ccordingly, the cosmetics and aesthetics of the property are not at issue." *Id.* at *10. Therefore, it held that determining whether the dock wall was "damaged" was best assessed by determining whether there was "a quantifiable loss in the property's usefulness or in its function for normal purposes." *Id.* Because there was a genuine dispute of fact as to whether the dock's ability to "safely function as a dock" had been compromised, the court held that Ports of Indiana had not yet

17

met its initial burden to show that the property was damaged nor that the damage was covered by the policy.

Cincinnati Insurance argues that *Ports of Indiana* stands for the proposition that mere cosmetic damage not visible to the ordinary viewer does not constitute direct physical loss unless a plaintiff can show that the property at issue has suffered a fortuitous and cognizable reduction in usefulness or in ability to safely serve its purpose.  (Def.'s Resp. & Br. Supp. Def.'s Mot. Summ. J. (dkt. #50) 13-14.)  Because it is undisputed for purposes of plaintiffs' motion for summary judgment that the denting is purely cosmetic *and* not visible from ground level, Cincinnati Insurance argues *Ports of Indiana* compels a finding of no coverage in this case.

The court disagrees.  In *Ports of Indiana*, there was a genuine dispute of fact as to whether the portion of the wall for which the plaintiff sought coverage had been affected in *any* way.  Cosmetic damage was not even an issue in that case -- not because damage that is not easily visible can never constitute "physical loss," but because it appears that the damage that the plaintiff claimed was purely structural.  *See Ports of Indiana*, 2011 WL 5523419, at *10 ("To clarify, the Court is not conflating usability with physical damage.  As anyone who has driven a beat-up jalopy knows, a damaged piece of property can often still be used.  However, *where the damage is said to have reduced the ability of the property to safely function as a dock*, . . . Ports needs to show that the dock wall suffered a fortuitous and cognizable reduction in its usefulness or that its ability to safely serve its purpose as a dock was compromised.") (emphasis added).

Thus, *Ports of Indiana* appears to stand for the proposition that an insured has the initial burden to prove the covered property has suffered damage that falls within the scope

18

of coverage.  In that case, the damage that the plaintiff alleged was a weakening of the structural integrity of the dock; the court accordingly declined to grant summary judgment to the insured because the insurer offered evidence to show that the dock wall's integrity was *not* compromised.  In the midst of identifying and analyzing that factual dispute, the *Ports of Indiana* court did not *also* interpret "direct physical loss" to exclude, as a matter of law, purely cosmetic damage that is not easily visible.  Rather, it appears that question was simply not at issue, which supports plaintiffs' contention that the *Ports of Indiana* decision is "[a]t best . . . irrelevant."  (Pls.' Reply (dkt. #62) 11.)

Still, Cincinnati Insurance's argument raises an interesting question:  if the only damage to a property is cosmetic and not visible, has an insured suffered a "loss?"  Neither side proposes *any* facts suggesting that the denting either does or does not affect the value of the Property.  Presumably, the core of Cincinnati Insurance's argument, however inartfully articulated, is that cosmetic damage that cannot be seen is functionally the same as no damage at all.

While a much closer case, the court is also not persuaded by this argument.  First, the Policy defines "loss" as "accidental loss *or* damage."  (*See* Larson Aff. Ex. 1 (dkt. #42-1) 53 (emphasis added).)  Even presuming that there has been no quantifiable "loss," the policy expressly contemplates the possibility that there may still be "damage," presumably giving it a different meaning than the word "loss."  *Cf. Manpower Inc. v. Ins. Co. of the State of Pa.*, No. 08C0085, 2009 WL 3738099, at *5 (E.D. Wis. Nov. 3, 2009) (noting that where insurance policy explicitly covered physical loss *and* physical damage, "'direct physical loss' must mean something other than 'direct physical damage,'" since otherwise policy language would be rendered superfluous).  Since the Policy specifically provided coverage for "damage

*or* "loss," Advance Cable arguably need not demonstrate a financial "loss" to establish coverage for "damage."

In discussing what triggers insurance coverage for "physical" damage, *Couch on Insurance* notes that:

> As with any insurance, property insurance coverage is "triggered" by some threshold concept of injury to the insured property. . . . In modern policies, especially of the all-risk type, this trigger is frequently "physical loss or damage," but may be any of several variants focusing on "injury," "damage," and the like. . . . There is little question this threshold has been met when an item of tangible property has been physically altered by perils like fire, or water.

10A *Couch on Insurance* § 148:46 (3d ed. 2013), *available at* Westlaw COUCH; *accord, e.g., Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.").

Here, there can be no meaningful dispute that a physical alteration to the property occurred.  Even assuming this alteration is merely cosmetic, as Cincinnati Insurance contends, there are still dents in the roof panels ranging from barely discernible to an inch or so in diameter.  That the denting is minor does not alter the fact that it is still a tangible alteration to the roof.  The Policy does not state that damage must reach some level of severity to trigger the coverage threshold.  For that matter, the Policy neither provides that damage must be visible from a particular, unspecified vantage point to trigger coverage, nor that damage must shorten the life or undermine the structural integrity of the Property to trigger coverage.

The limitations that Cincinnati Insurance seeks to impose on coverage cannot be found in the Policy's unambiguous language. *Cf. Webster v. Acadia Ins. Co.*, 934 A.2d 567, 572 (N.H. 2007) (rejecting an insurance company's assertion that physical alteration was "so minimal that it should not be considered property damage," because the policy did "not prescribe a minimum level of property damage necessary to initiate coverage" and so no "minimum measure of damage" was required). While Cincinnati Insurance offers a "remotely possible second interpretation" for the Policy's language, it does not justify a departure from the Policy's plain and ordinary meaning. *Kosieradzki ex rel. Kosieradzki v. Mathys*, 2002 WI App 191, ¶ 7 n.2, 256 Wis. 2d 839, 649 N.W.2d 717 (quoting *U.S. Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 503, 476 N.W.2d 280 (Ct. App. 1991)).

Even if this court were to find that the construction Cincinnati Insurance offers *is* plausible, that would only render the language of the Policy ambiguous, since Advance Cable's construction is at least as reasonable as Cincinnati Insurance's, if not more so. *See Badger Mut. Ins. Co. v. Schmitz*, 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223 ("Words or phrases of an insurance contract are ambiguous if they are susceptible to more than one reasonable construction."). Yet if policy language is ambiguous, the court is to construe such ambiguities *against the insurer* by looking at the policy through the eyes of an objectively reasonable insured. *Id.* Here, a reasonable insured would not read the Policy's grant of coverage for "accidental loss or damage" to cover only *severe* damage, *visible* damage, *structural* damage or even *non-cosmetic* damage. Regardless of any ambiguity in its language, the denting in this case constitutes "loss" as defined in the Policy.

21

### ii.     Covered Property at the Premises

The Policy defines Covered Property as including buildings or structures described in the Declarations, (*see* Larson Aff. Ex. 1 (dkt. #42-1) 22), and provides $2,075,000 of "blanket building" coverage, (*id.* at 19).  The Policy defines "premises" as "the Location of Premises described in the Declarations."  (*Id.* at 54.)  In turn, the Declarations refer to a "Schedule of Locations" as a form applicable to all coverage parts.  (*Id.* at 2.)  The Schedule of Locations includes two addresses, the second of which is 2113 Eagle Dr., Middleton, WI 53562-2551.  (*Id.* at 5.)  The parties do not dispute that the hailstorm dented the metal roof of a covered commercial building located at 2113 Eagle Drive.  Therefore, there can be no doubt that this coverage requirement is fulfilled.

### iii.    Caused by or Resulting from Any Covered Cause of Loss

The Policy defines "Covered Cause of Loss" as meaning "risks of direct physical loss," unless the loss is otherwise excluded or limited in Sections A.3.b or A.3.c of the Policy.  The Policy, therefore, covers *all* risks, unless specifically excluded.

Cincinnati Insurance does not argue that hail is not a covered cause of loss.  In fact, Cincinnati Insurance does not identify *any* exclusion or limitation in the enumerated sections of the Policy that would exclude hailstorms from the definition of "Covered Cause of Loss."  As already noted, "summary judgment is the 'put up or shut up' moment in a lawsuit."  *Johnson*, 325 F.3d at 901.  Cincinnati Insurance has failed to put forth *any* evidence suggesting that hail is an excluded cause of loss.  Accordingly, Advance Cable has not met its burden to show that there is some dispute of material fact as to whether the denting in this case resulted from a "covered cause of loss."

22

Having interpreted the Policy as a matter of law, there can be no dispute that the Policy extends coverage to the denting here even as Cincinnati Insurance would characterize it.  Therefore, Advance Cable is entitled to partial summary judgment on the question of whether the Policy affords coverage for the denting.  Of course, this leaves open the question as to the monetary or non-monetary relief to which Advance Cable might be entitled, if any.

### B.  Cincinnati Insurance's Motion for Summary Judgment

The court has already determined as a matter of law that the hail denting at issue constitutes "direct physical loss" and is covered by the Policy.  Cincinnati Insurance's cross-motion for summary judgment on that question is, therefore, denied.

Cincinnati Insurance also asks the court to grant summary judgment on the bad faith claim.[8]  A claim of bad faith in Wisconsin is a distinct tort claim that "has its roots in the special duty of fair dealing and good faith owed by the insurer to the insured by virtue of the insurance contract."  *Duir v. John Alden Life Ins. Co.*, 754 F.2d 245, 249 (7th Cir. 1985).  To prove a claim of bad faith, an insured must show: (1) the absence of any reasonable basis by the insurer for denying the benefits of the policy to the insured; and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.  *Id.*

---

[8] As a preliminary matter, Cincinnati Insurance argues that "there is no issue of fact that Cincinnati did pay the claim to plaintiffs' satisfaction" and that the bad faith claim therefore fails as a matter of law.  (*See* Def.'s Resp. & Br. Supp. Def.'s Mot. Summ. J. (dkt. #50) 20.)  The evidence it offers, however, pertains only to: (1) claims for denting to the vent caps and air conditioning fins; and (2) claims for the 2110 Pinehurst Drive property.  Neither of those claims is at issue in this case, nor do Cincinnati Insurance's payments on *those* claims demonstrate that it also paid the claim for damage to the roofing panels at 2113 Eagle Drive.  (*See* Jorgenson Aff. Ex. B (dkt. #52-2) 2-4 (nothing in estimate deals with roofing panels).)  While Advance Cable should have explicitly proposed the lack of payment on the claim as a finding of fact, the court will not credit a "fact" that is apparently false, particularly since Cincinnati Insurance continues to argue that it should *not* have to pay the claim for the 2113 Eagle Drive roof panels.

(citing *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 691, 271 N.W.2d 368 (1978)). Relevant to this inquiry is "whether a claim was investigated appropriately and whether the results of the investigation were evaluated and reviewed reasonably." *McVeigh v. Unumprovident Corp.*, 300 F. Supp. 2d 731, 739 (W.D. Wis. 2002). "If an insured's claim is 'fairly debatable' either in fact or law, an insurer cannot be said to have denied the claim in bad faith." *Id.* This is because an insurer -- after exercising its duty of ordinary care and reasonable diligence investigating and evaluating the claim -- "is entitled to debate and/or litigate the claim if it feels that there is a question of law or fact which must be decided before the insurer, in good faith, is required to pay." *Duir*, 754 F.2d at 249.

The court has found as a matter of law that the Policy affords coverage to the denting in this case, but it is loath to find that Cincinnati Insurance had *no* reasonable basis for denying Advance Cable payment for the roof of the 2113 Eagle Drive property. The undisputed facts indicate that after the hailstorm, Larson apparently accepted a payment for hail damage to HVAC units and metal vent caps, accompanied by Jorgenson's reiteration that "[a]s noted during our inspection, [we] did not observe any damage to roofing." (Jorgenson Aff. Ex. B (dkt. #52-2) 2.) After that exchange, nothing more occurred with regard to that property until Larson contacted Jorgenson again in January 2012, requesting a re-inspection of the roofing. At that time, Jorgenson had SRI inspect the roof. SRI's Report of February 23, 2012, states that the inspector observed some denting, but that it would not "affect the performance of the panels (roofs) or detract from the panels['] (roofs) life expectancy." (*See* Rattan Aff. Ex. A (dkt. #24-1) 1.)

Most importantly, after the SRI report, it does not appear that Advance Cable provided any information suggesting that the SRI report was wrong. Advance Cable *did*

24

offer a counter-estimate from Ruedebusch Development & Construction, which indicated that roof panels were in need of repair or replacement, but that estimate apparently pertained only to the 2210 Pinehurst Drive property.  (*See* Jorgenson Aff. Ex. H (dkt. #52-7) 2.)   Only when opposing Cincinnati Insurance's motion for summary judgment did Advance Cable provide an affidavit from roofer Scott Martin, which states that the hail produced fractures in the galvanization on the roof panels, causing them to pit and corrode, which will eventually lead to deterioration, corrosion and a premature failure of the roof. (*See* Martin Aff. (dkt. #67) ¶¶ 5-6.)

Cincinnati Insurance's justification for nonpayment is, in essence, that there is nothing to pay, because the roof is neither functionally nor financially marred.  As the court has already recognized, Cincinnati Insurance was legally *wrong* in asserting that such damage was not "covered" under the terms of the Policy, but "[t]he fact that coverage under the policy was ultimately established fails to prove the insurer denied the policy claim in bad faith," *Mills v. Regent Ins. Co.*, 152 Wis. 2d 566, 573, 449 N.W.2d 2994 (Ct. App. 1989), and the court concludes that Cincinnati Insurance acted reasonably in debating both the question of (1) whether there was a cognizable claim for coverage and (2) if so, whether any monetary or specific relief is even called for in the case of an arguably undetectable cosmetic injury.

In asking whether "a reasonable insurer under the circumstances [would] have denied or delayed payment of the claim," *Anderson*, 85 Wis. 2d at 692, the court is persuaded by the fact that, up until the filing of this lawsuit -- indeed, until even more recently -- the facts available to Cincinnati Insurance indicated that (1) the roof was not structurally damaged, and (2) the denting could not be seen from the ground.  Given these facts, Cincinnati

Insurance apparently concluded there was nothing for which to compensate Advance Cable because, financially speaking, they had suffered no losses.

This is not a case in which "the insurer . . . refused even to consider the nature and extent of the plaintiffs' damages, and specifically rejected and spurned the opportunity to evaluate and consider the submitted proof of loss." *Anderson*, 85 Wis. 2d at 692.  Nor is this a case in which Cincinnati Insurance claimed to have relied on a report not yet in existence when it denied coverage, *see Poling v. Wis. Physicians Serv.*, 120 Wis. 2d 603, 606-09, 357 N.W.2d 293 (Ct. App. 1984), nor a case in which Cincinnati Insurance flatly denied coverage and ignored contrary evidence until it found an expert to support its theory, *see Benke v. Mukwonago-Vernon Mut. Ins. Co.*, 110 Wis. 2d 356, 363-65, 329 N.W.2d 243 (Ct. App. 1982).  Rather, the evidence Cincinnati Insurance had showed that repair or replacement of the dented panels would have no practical impact on the roof and, hence, on Advance Cable.

Perhaps Cincinnati Insurance should not have made its stand on the theory that the Policy did not provide *coverage* for the denting and instead should have put Advance Cable to its proof with regard to any compensable structural or financial impact due to the hail denting.  But the court also concludes Cincinnati Insurance had a right to debate the need to *pay* Advance Cable, given that SRI apparently concluded there was no need for repair or replacement.  *See id.* at 693-94 ("An insurer should have the right to litigate a claim when it feels there is a question of law or fact which needs to be decided *before it in good faith is required to pay the claiman*t.") (quoting Thornton & Blaut, *Bad Faith and Insurers: Compensatory and Punitive Damages*, 12 Forum 699, 719 (1977) (emphasis added)).

Advance Cable raises numerous arguments in support of its claim of bad faith, but the court finds none persuasive.[9]  Advance Cable first raises the $10,000 dollar settlement with respect to the 2110 Pinehurst Drive property, arguing that this offer was not based on repair cost estimates and demonstrates "lowballing."   The court declines to find that Cincinnati Insurance's decision to settle a claim *on a different property*, despite the SRI report suggesting repair or replacement was unnecessary, is evidence of its bad faith in declining to settle the claim on *this* property -- particularly because the Ruedebusch estimate applied only to the 2110 Pinehurst Drive property.  Advance Cable also argues that Cincinnati Insurance's retention of SRI evinces bad faith because SRI came to the same conclusion of no structural damage in a different case before this court, but without something more substantial undermining SRI's neutrality, the court does not believe that allows for a reasonable inference that Cincinnati Insurance's investigation was insufficiently "neutral" or "detached."

Finally, Advance Cable argues that because Cincinnati Insurance has, as of March 18, 2013, sought the Office of Commissioner of Insurance's approval to utilize a new "coverage limitation for roofs and roof surfaces" exclusion, Cincinnati Insurance obviously knew that coverage was not fairly debatable under its *current* Policy language.  Whatever arguable bearing this may have on the *subjective* portion of a bad faith inquiry, it does not

---

[9] The court notes that, despite Advance Cable's repeated arguments that Cincinnati Insurance has "hardly [shown] unequivocal evidence that [it] is acting in good faith," (Pls.' Resp. (dkt. #64) 18), Cincinnati Insurance is not obligated to provie that it acted in *good* faith; it is *Advance Cable's* burden to prove that Cincinnati Insurance acted in *bad* faith.  *See Anderson*, 85 Wis. 2d at 691 (noting what a plaintiff must show to show a claim for bad faith); *Hejsak v. Great-West Life & Annuity Ins. Co.*, 331 F. Supp. 2d 756, 767 (W.D. Wis. 2004) (granting insurer's motion for summary judgment because "[p]laintiff ha[d] not met her burden to show that defendant acted in bad faith").

mean that Cincinnati Insurance's decision to debate the need to pay Advance Cable is *objectively* unreasonable, and both elements are necessary to maintain a bad faith claim.

In *Mills v. Regent Insurance Company,* the Wisconsin Court of Appeals pointed with approval to a First Circuit decision, *Pace v. Insurance Company of North America*, 838 F.2d 572 (1st Cir. 1988), that discussed the Wisconsin Supreme Court's *Anderson* decision at length and concluded that "both an *objective* and *subjective* component are required" in showing bad faith. *Id.* at 584.  Agreeing with the *Pace* court's reading of *Anderson,* the Wisconsin Court of Appeals concluded that the trial court in *Mills* had properly directed a verdict against the insured "[b]ecause the evidence produced by the parties, viewed in the light most favorable to [the insured], failed to establish that no objectively reasonable basis existed" to deny his claim.  *Mills*, 152 Wis. 2d at 576.  As in *Mills*, the absence of proof of the *objective* element of the bad faith test is fatal to Advance Cable's claim.  *See id.* (noting that the failure to establish a lack of reasonable basis for denial of the claim made it unnecessary to consider whether the insured had established the subjective element of the case).[10]


### III. Advance Cable's Motion to Strike

Finally, Advance Cable has also moved to strike two affidavits and supplemental proposed findings of fact from Cincinnati Insurance's summary judgment submissions.  This dispute began when Cincinnati Insurance moved for summary judgment on the assumption that Advance Cable did not dispute the denting at issue was merely cosmetic.  In response, Advance Cable proffered an affidavit from Scott Martin, who avers that the denting has

---

[10] Advance Cable has moved to compel discovery on the bad faith claim  Given the court's resolution of the bad faith claim, that motion (dkt. #95) will be DENIED as moot.  The motion to bifurcate trial in this matter (dkt. #22) will likewise be DENIED as moot.

caused deterioration and corrosion and will eventually lead to a premature failure of the roof.  (*See* Martin Aff. (dkt. #67).)  Cincinnati Insurance then argued that Advance Cable should be estopped from arguing that the denting was anything more than cosmetic, because it had not shared this information with Cincinnati Insurance before.  Specifically, Cincinnati Insurance argued, the court should not consider the Martin affidavit.

In support of its position, Cincinnati Insurance itself offered two new affidavits and additional proposed findings of fact.  The affidavit of Gregory J. Phillips is meant in large part to authenticate the SRI report he prepared.  (*See* Phillips Aff. (dkt. #76).)  The affidavit of Curt Jorgenson primarily supports Cincinnati Insurance's estoppel argument by establishing that Advance Cable neither argued the damage was structural nor contradicted the SRI report until it filed the Martin affidavit in September of 2013.

Advance Cable argues that Cincinnati Insurance has effectively raised a new issue in its reply brief and should be ignored on that basis alone.  *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989).  Cincinnati Insurance responds that the purported "new matter" simply replies to Advance Cable's *own* new argument, set forth for the first time in its response brief, that the roof is structurally damaged, not merely cosmetically.  The court agrees.  Advance Cable appears to admit that it had not previously introduced evidence with respect to possible structural damage to the roof, arguing in its motion to strike that Advance Cable had no obligation to "disprove the faulty factual assumptions that Cincinnati's faulty legal analysis relies upon."  (Pls.' Br. Supp. Mot. Strike (dkt. #79) 2.)  Until that issue became part of the case, when Advance Cable raised it to combat Cincinnati Insurance's motion for summary judgment, Cincinnati Insurance had no reason to put the

nature of the damage in dispute.  The court declines to hold that Cincinnati Insurance should have preemptively argued to exclude any claims of structural damage.

At the same time, Cincinnati Insurance's underlying argument -- that Advance Cable is estopped from claiming the roof has been structurally damaged -- is also incorrect. Advance Cable had no duty to disclose its own evidence until required to do so by Cincinnati Insurance's motion for summary judgment or by the deadline for revealing expert reports as set forth in the court's scheduling order.  Certainly, its own motion for partial summary judgment was that the Policy provided coverage *regardless* of the nature or extent of the denting.  While it would have been *wiser* for Advance Cable to have informed Cincinnati Insurance of these opinions earlier -- particularly since Cincinnati Insurance might have, as it represents, been more inclined to settle this claim without the months of litigation that has resulted and, in any event, since it would have strengthened Advance Cable's bad faith claim -- Advance Cable's decision to wait until its summary judgment response to advance this proof does not estop it from pursuing that argument for the purpose of establishing damages.  Thus, although the court denies Advance Cable's motion to strike, the affidavits and additional proposed findings of fact do not affect this court's decision on the parties' cross-motions for summary judgment.


ORDER

IT IS ORDERED that:

1) Defendant The Cincinnati Insurance Company's Motion for Additional Time to Respond to Plaintiffs' Motion for Partial Summary Judgment (dkt. #46) is DENIED.

2) Plaintiffs Advance Cable Company, LLC and Pinehurst Commercial Investments, LLC's Motion for Partial Summary Judgment (dkt. #40) is GRANTED.

3) Defendant's Motion for Summary Judgment (dkt. #49) is GRANTED IN PART and DENIED IN PART as set forth with the opinion above.

4) Plaintiffs' Motion to Strike (dkt. #79) is DENIED.

5) Plaintiffs' Motion for Bad Faith Discovery (dkt. #95) is DENIED as moot.

6) Defendant's Motion to Bifurcate (dkt. #22) is DENIED as moot.

Entered this 12th day of March, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge